Argued and submitted November 15, 2012, on cross-appeal, reversed and remanded; appeal dismissed as moot June 19, 2013

Olaf A. KALFAS
and Nina E. Kalfas,
Trustees of the Olaf A. Kalfas and Nina E. Kalfas
Revocable Living Trust dated January 19, 2004,
*Plaintiffs-Respondents*
*Cross-Appellants,*

*v.*

Carol ADAMS,
*Defendant-Appellant*
*Cross-Respondent.*

Jackson County Circuit Court
073257E2; A146081

306 P3d 706

Clayton C. Patrick argued the cause and filed the briefs for appellant-cross-respondent.

Joseph E. Kellerman argued the cause for respondents-cross-appellants. With him on the briefs were Eric B. Mitton and Hornecker, Cowling, Hassen & Heysell, L.L.P.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Hadlock, Judge.

SCHUMAN, P. J.

## SCHUMAN, P. J.

Plaintiffs brought this action seeking a determination that, pursuant to the terms of a written agreement, they have an express easement over defendant's property. They also sought to enjoin defendant from interfering with the easement and damages for defendant's interference. Defendant denied that plaintiffs have such an easement or, if they do, that defendant has interfered with it. Defendant also counterclaimed for a determination that, if plaintiffs have an easement, it is subject to reasonable restrictions. The trial court determined that, pursuant to the terms of a written easement agreement, plaintiffs have an easement over defendant's property, but that they cannot use an existing road over defendant's property for that purpose and, instead, must build a new road in a different location at their own expense. The trial court also declined to award attorney fees to either party. Defendant appeals, contending that she is the prevailing party and entitled to attorney fees under the terms of the easement agreement. Plaintiffs cross-appeal, asserting that, under the unambiguous terms of the easement agreement, they are entitled to use the existing road on defendant's property for access to the northwestern part of their property. We agree with plaintiffs' argument on cross-appeal and therefore reverse the trial court and remand, obviating the need to address defendant's appeal concerning attorney fees.

Plaintiffs have asked the court to exercise its discretion to review the record *de novo.* ORS 19.415(3); ORAP 5.40(8). *See Knight v. Nyara,* 240 Or App 586, 248 P3d 36 (2011) (claim for declaration of rights under easement and injunction subject to *de novo* review under ORS 19.415(3) (2007)); *Hammond v. Hammond,* 246 Or App 775, 777, 268 P3d 691 (2011) (quiet-title actions are equitable in nature). We have agreed to do so in exceptional cases. *See* ORAP 5.40(8)(c) ("The Court of Appeals will exercise its discretion to try the cause anew on the record or to make one or more factual findings anew on the record only in exceptional cases.").[1] Because we conclude that the trial court based its

---

[1] ORAP 5.40 provides, in part:

"The appellant's opening brief shall open with a clear and concise statement of the case, which shall set forth in the following order under separate headings:

ruling on findings that are not supported by the evidence in the record and, further, that a correct outcome in this case is dependent on additional findings that the trial court did not make, we exercise our discretion to review *de novo*, deferring to the trial court's credibility judgments insofar as they are based on demeanor. *Uwimana and Gwangano*, 209 Or App 693, 696, 149 P3d 257 (2006).

We summarize the facts, which are largely undisputed, based on our *de novo* review of the record. Plaintiffs and defendant own neighboring parcels in rural Jackson

"*****

"(8)(a) In those proceedings in which the Court of Appeals has discretion to try the cause anew on the record and the appellant seeks to have the court exercise that discretion, the appellant shall concisely state the reasons why the court should do so.

"(b) In those proceedings in which the Court of Appeals has discretion to make one or more factual findings anew on the record and the appellant seeks to have the court exercise that discretion, the appellant shall identify with particularity the factual findings that the appellant seeks to have the court find anew on the record and shall concisely state the reasons why the court should do so.

"(c) The Court of Appeals will exercise its discretion to try the cause anew on the record or to make one or more factual findings anew on the record only in exceptional cases. Consistently with that presumption against the exercise of discretion, requests under paragraph (a) or (b) of this section are disfavored.

"(d) The Court of Appeals considers the items set out below to be relevant to the decision whether to exercise its discretion to try the cause anew on the record or make one or more factual findings anew on the record. These considerations, which are neither exclusive nor binding, are published to inform and assist the bar and the public.

"(i) Whether the trial court made express factual findings, including demeanor-based credibility findings.

"(ii) Whether the trial court's decision comports with its express factual findings or with uncontroverted evidence in the record.

"(iii) Whether the trial court was specifically alerted to a disputed factual matter and the importance of that disputed factual matter to the trial court's ultimate disposition of the case or to the assignment(s) of error raised on appeal.

"(iv) Whether the factual finding(s) that the appellant requests the court find anew is important to the trial court's ruling that is at issue on appeal (i.e., whether an appellate determination of the facts in appellant's favor would likely provide a basis for reversing or modifying the trial court's ruling).

"(v) Whether the trial court made an erroneous legal ruling, reversal or modification of which would substantially alter the admissible contents of the record (e.g., a ruling on the admissibility of evidence), and determination of factual issues on the altered record in the Court of Appeals, rather than remand to the trial court for reconsideration, would be judicially efficient."

County. Defendant's parcel is 40 acres. It is improved with a house in its northeastern corner and is landlocked. Defendant's only access to her property is through a road on plaintiffs' property. Rugged terrain prevents plaintiffs from reaching the northwestern 200 acres of their property by vehicle, except through defendant's property. Thus, defendant's access to her property must be through plaintiffs' property, and plaintiffs' access to the northwestern corner of their property must be through defendant's property.[2]

At one time, both plaintiffs' and defendant's property were held in common ownership. In 1989, Patricia and Steven Cutler owned the entire 320 acres, and lived at the homesite currently owned by plaintiffs, to the east of what is now defendant's property. In 1990, the Cutlers partitioned the property to carve out a 40-acre parcel and obtained conditional approval for a homesite from Jackson County. The conditional approval described the location for the approved homesite. In 2000, the Cutlers sold the 280-acre parcel to plaintiffs' predecessors, the Furrows, and retained the 40-acre parcel, later sold to defendant, for the purpose of development as a homesite.

Currently, a private roadway runs through both parcels. Its path is irregular and it begins generally at an eastern boundary of plaintiffs' property, and runs generally in a southwesterly direction to the eastern boundary of defendant's property, where defendant has placed a gate. Aerial maps in evidence dating from 1969 show that from that point, the road continues north to the location of defendant's house. Additionally, more recent maps shows that from the gate installed by defendant, a new road—defendant's driveway—splits to the west of the roadway and heads in a northwesterly direction to her homesite. But the roadway itself also continues north to defendant's homesite and passes defendant's home on its eastern side. The trial court referred to the portion of the roadway from plaintiffs' homesite to defendant's homesite as the "Adams Road." From defendant's homesite, the roadway continues north through the northeastern corner of defendant's property and into the

---

[2] A schematic map at the end of this opinion shows the relative location of the relevant parcels, roads, and gates.

northwestern portion of plaintiffs' property, along the top of a ridge. The trial court referred to this portion of the roadway as the "Ridge Road."

It is undisputed and the trial court found that, although aerial photos dating back at least to 1969 show the described roadway in its present locations (with the exception of defendant's driveway), at the time the Cutlers acquired their property in 1989 and when they sold the 280-acre parcel to the Furrows in 2000, the roads to the west of plaintiffs' homesite and on defendant's property were in a state of disrepair—rutted, overgrown with shrubs—and for the most part impassable by vehicles larger than a motorcycle. In fact, the roads had fallen into such disrepair that Patricia Cutler—a party to the disputed easement agreement—testified that, other than the access road to the Cutler's homesite, there were *no* roads on the property at the time she lived there. The trial court found Patricia Cutler, who testified by telephone, to be a credible witness, but it is not clear whether that credibility determination was demeanor based. In any event, Patricia Cutler's testimony regarding the absence of roads is inconsistent with the overwhelming evidence in the record that there were many roads over the property but that they were mostly impassable due to rutting and overgrowth of Manzanita. Accordingly, we give her testimony concerning the absence of roads less weight than did the trial court.

Before closing on the 2000 sale to the Furrows, the Cutlers and Furrows executed an easement entitled "Private Roads Maintenance and Access Agreement." The agreement, drafted by the Cutlers, provided, in relevant part:

"THIS DECLARATION of agreement is made this 9[th] day of August, 2000, by Steven Cutler and Patricia Cutler, husband and wife and William Furrow and Laurellyn M. Furrow, husband and wife, hereinafter called Declarants, for themselves, their heirs, personal representatives, successors, grantees and assigns.

"A.   WHEREAS, the Declarants are the owners of land located in Jackson County, Oregon, *over which a private road and logging roads* are currently located, and which are more particularly described as follows:

"Declarants hereby grant each other non-exclusive easements allowing unrestricted ingress and egress *across all existing roads (logging, main roads and any others) as well as any roads that may be built in the future,* including the right to improve those roads and add services at their own expense to permit future development of the declarants' lands which may be allowed and approved by the City, County or state.

"B.  WHEREAS, the parties desire to utilize the private roads for common ingress and egress to their respective properties and to maintain same according to the terms and provision thereof.

"C.  NOW, THEREFORE, Declarants hereby declare that the private roads herein described shall be subject to the following conditions which are for the purpose of protecting the value and desirability of, and which shall run with, the real property owned by the Declarants and described herein, and shall be binding upon all parties having any right, title, or interest in such real property or any part thereof, including their heirs, personal representatives, successors, grantees, and assigns, and same shall enure to the benefit of each owner of such properties.

"1.  Declarants are the owners of the real property set forth in Exhibits 'A' and 'B' attached hereto and incorporated herein, and hold title thereto as set forth in said Exhibits.

"2.  Each of the Declarants, as owners, shall have a right of way and easement of ingress and egress over and across the private roads herein described, which shall be appurtenant to and pass with the title to each of their respective parcels as herein described, subject to the provisions herein contained.

"3.  The private roads shall be used for ingress and egress purposes only and shall not be obstructed by any owner for any purpose, unless with prior written consent of all owners. *The present improved private road is presently graded and graveled and is utilized as a road* and shall be maintained and repaired in a similar condition for such purpose. This shall not preclude any rights granted and created in Paragraph 'A' above.

"4.  The expenses of maintaining and repairing the private roads shall be paid in an amount that is proportionate to the declarants['] use of said private roads.

"\* \* \* \* \*

"6. In the event suit, or action, or appeal thereof, is brought in the premises of this Declaration, the losing party or parties shall pay the prevailing party or parties reasonable attorney fees as determined by the Court."

(Emphasis added.) The agreement attached the descriptions of the two parcels, as well as a description of other property owned by the Cutlers that was contiguous to the Furrows' property and through which the Furrows had access to their parcel, but there were no descriptions of any roads.

In 2002, the Cutlers hired Elvis Offenbacher to build access to the 40 acres parcel and a pad for a homesite. Offenbacher testified that he "rebuilt" the section of the existing Adams Road between the homesite on the 280-acre parcel and the eastern boundary of the 40-acre parcel, and that he also built a new road, or driveway, "from the saddle" on Adams Road (the location of defendant's gate) to a pad for a homesite. The evidence shows that the pad that Offenbacher excavated was either on or immediately west of the roadway and some 500 feet to the north and 140 feet to the east of the homesite location that had been approved by the county in 1990 and that was subsequently reapproved by the county when defendant applied for her building permit in 2004.

The Cutlers sold the 40-acre parcel to defendant in late 2003, and in 2004, defendant built a house on the pad that had been excavated by Offenbacher, not at the location approved by the county. The pad and, ultimately, the house, were constructed almost on or immediately west of the roadway as it travels north toward the northwestern portion of plaintiffs' property.

In September 2006, after defendant's house had been completed, the Furrows sold the 280-acre parcel to plaintiffs.[3] When they purchased the property, plaintiffs believed that the "Private Roads Maintenance and Access Agreement" gave them access to the northwestern portion of their property through defendant's property, including the new road or driveway, and they used it, passing on motorbikes

_____

[3] The Furrows sold the property to Olaf and Nina Kalfas as trustees of the Kalfas Trust. For convenience here we refer to them together as plaintiffs.

and all-terrain vehicles along the rebuilt portion of the roadway and through defendant's property, as well as next to her house on the new road built by Offenbacher.

Before plaintiffs moved onto their property, defendant had experienced a break-in and, for security reasons, in January 2007, she placed an unlocked gate across the road at the eastern boundary of her property. Plaintiffs objected to the gate, asserting that it interfered with their unrestricted access to the easement road. Defendant has also landscaped her property in a way that plaintiffs claim further interferes with their use of the easement.

Plaintiffs' second amended complaint sought a declaration that they have an easement along the roadway shown on a 2001 aerial photo for unrestricted ingress and egress across defendant's property to their property and sought to enjoin defendant from interfering with plaintiffs' use of the roadway, as well as damages of $2,000 for past interference. Notably, plaintiffs' claim is based on an easement that they allege they have on the roadway as shown on an aerial map from 2001 (Plaintiffs' Exhibit 5), including that portion of the road "rebuilt" by Offenbacher in 2002. Plaintiffs have not asserted an easement over the new road constructed by Offenbacher in 2002 to the west of the old road, which defendant describes as her driveway. In fact, plaintiffs expressly contend that the roadway over which they claim an easement—the road at issue—was in existence at the time of the execution of the easement agreement. In the alternative, plaintiffs requested a determination that they have an implied easement for access to the northwestern part of their property. Defendant denied that plaintiffs have an easement across her property and filed a counterclaim for a declaratory judgment, seeking to impose restrictions on plaintiffs' use of the easement.

The trial court put considerable effort into this case, including a view of the property. In a thorough opinion, the court concluded that the "Private Roads Maintenance and Access Agreement" was ambiguous with respect to what the parties intended and what they considered to be "existing roads." The court made these findings based on evidence presented at trial:

"The road that generally runs by [plaintiffs'] homesite in a westerly direction to [defendant's] homesite will be called the Adams Road; the road that runs north of [defendant's] homesite will be called the Ridge Road.

"1. The Adams Road and Ridge Road were most likely built in the 1940s and 1950s as part of logging operations in the area. Thereafter, these roads fell into disrepair and in large part became impassable by motor vehicles.

"* * * * *

"3. In 1999, the Cutlers hired Realtor Horton to advise them about developing their properties * * *. Realtor Horton advised them that they needed to (1) draft an easement that would provide access to [defendant's] property and (2) build an access road from what is now [plaintiffs'] homesite to what is now defendant's homesite. In 1999 Realtor Horton could not drive up what appeared to be a trail between [plaintiffs'] homesite and [defendant's] homesite.

"4. The Cutlers lived at [plaintiffs'] homesite until the year 2000. At that time, Patricia Cutler testified that the road did not continue past [plaintiffs'] homesite up to [defendant's] homesite. No vehicular traffic could travel from [plaintiffs'] homesite to [defendant's] homesite at that time.

"5. In 1990, the Cutlers proceeded to obtain approval from the County to establish a homesite on [defendant's] property.

"6. In 2000, the Cutlers sold the 280-acre * * * lot to the Furrows. At or around the time of that sale, Steven and Patricia Cutler entered into an easement agreement with William and Laurellyn Furrow. * * *

"7. In 2002, the Cutlers hired Elvis Offenbacher to build a road between [plaintiffs'] homesite and [defendant's] homesite. At that time, Offenbacher described the access to [defendant's] homesite from [plaintiffs'] homesite as a 'trail,' which could not be used by motor vehicles to access [defendant's] homesite.

"8. From 2000, when Mr. Furrow purchased [plaintiffs'] lot, until 2002 when the access road was built up to [defendant's] homesite, William Furrow indicated that he was never able to drive up the access path to [defendant's] homesite but always walked the path.

"9.  In October 2003, [defendant] purchased the 40-acre lot from the Cutlers. At that time, the pad for the homesite had been created along with an access road to the homesite from [plaintiffs'] homesite."

Based on its findings, the court reached these conclusions:

"A.  The Adams Road and the Ridge Road, as described above, appear to originally have been old logging roads built in the 1940s and 1950s. Over time, roads deteriorated and became generally impassable by motor vehicles. Certain portions of those roads, principally the Ridge Road, were improved by contracts with the City of Jacksonville to service fuel breaks in the area.

"B.  When the subject easement was signed on August 9, 2000, the path between [plaintiffs'] homesite and [defendant's] homesite was not a road that could be traveled on with a motor vehicle. A road for vehicular traffic was built in 2002 by the Cutlers."

As noted, the trial court concluded that the easement was ambiguous, specifically with respect to the meaning of the term "existing road." Based on evidence of the circumstances surrounding the easement's execution, the court concluded that, because they were not developed for vehicular travel, the Adams and Ridge Roads were not "existing roads" at the time of the execution of the easement. The court found that, although the Cutlers and the Furrows contemplated that the easement would provide reasonable access across the 40-acre parcel to the northwestern corner of what is now plaintiffs' property, they "could not have intended to create an easement for the benefit of the owner of the [280-acre parcel] that would pass directly through the homesite location that the Cutlers had created on [defendant's] property." The necessary consequence of the trial court's analysis was that plaintiffs' rights under the easement agreement did not encompass the use of the roadway across defendant's property.

The trial court nonetheless concluded that plaintiffs had an easement over defendant's property for access to the northwestern corner of their property, even if it could not be over the existing roads. Relying on the easement's provision granting access to "roads that may be built in the

future," the trial court concluded that the original parties to the easement—the Cutlers and the Furrows—"intended to create reasonable access across [defendant's] lot to the northwest portion of [plaintiffs'] lot, if it could not be secured in other places."

Although no party had requested it, based on the judge's view of the property and his own experience building roads, the court found that no other reasonable access to the northwest corner could be secured in other places, so plaintiffs could have reasonable access to the northwest corner of their property through defendant's property on a new road that the court authorized plaintiffs to build at a location different from the existing roadway, to the west of defendant's homesite, and "as far away from the residence established by [defendant] as possible." The court declared that plaintiffs could build the road on defendant's property in conformance with these requirements:

> "The road surface at the time of installation shall be no wider than 12 feet with right-of-way extending 4 feet on both sides of the road surface for a total of 20 feet. The right-of-way is intended to accommodate fuel breaks, installation of utilities and the widening of the road, all as approved by appropriate government agencies, to accommodate use of this easement for the development of Plaintiffs' property to the north of Defendant's property."

The court explained that, once installed, the road would fix the location for plaintiffs' easement for access across defendant's property. The court further determined that the road would be subject to a maximum speed limit of 15 miles per hour and that "[p]laintiffs and their invitees should make every reasonable effort to restrict use of the easement to daylight hours, but in no case shall the road be used before 5:00 a.m. or after 11:00 p.m. unless exigent or emergency circumstances exist that would justify such use." Having determined that plaintiffs were entitled to an easement on a road to be built at a different location, the trial court did not address plaintiffs' contention that defendant's landscaping has encroached upon their easement on the existing roadway or defendant's counterclaim seeking the imposition of reasonable restrictions on plaintiffs' use of an easement on the existing roadway.

Defendant's appeal is limited to the question whether the trial court erred in determining that defendant was not entitled to attorney fees. On cross-appeal, plaintiffs contend that the trial court misconstrued the easement agreement's reference to "existing roads (logging, main roads and any others)" to mean only roads that are drivable by a motor vehicle. In plaintiffs' view, the easement covers *any* existing road, even one that is not currently passable by motor vehicle. Plaintiffs assert further that the trial court erred in effectively extinguishing their easement over the existing roadway through defendant's property and in requiring them to construct a new road at their own expense. Because we agree with plaintiffs, we do not reach the other issues raised on appeal and cross-appeal.

The construction of an express easement is a question of law. *Bloomfield v. Weakland*, 224 Or App 433, 199 P3d 318 (2008), *rev den*, 346 Or 115 (2009); *Kell v. Oppenlander*, 154 Or App 422, 426, 961 P2d 861 (1998). As we recently said in *Knight*, 240 Or App at 595, in construing an easement, the court seeks to discern the nature and scope of the easement's purpose to give effect to that purpose in a practical manner. To determine an easement's purpose, the court first looks to the words of the easement, viewing them in the context of the entire document. If the words clearly express the easement's purpose, the analysis ends. In giving effect to an easement's purpose, general principles of reasonableness control. *Id*. If the court determines that the easement is ambiguous, the court looks to relevant surrounding circumstances for evidence of the original parties' intent, including consideration of the easement's purpose and the manner in which the parties used the easement. *Tipperman v. Tsiastsos*, 327 Or 539, 544-45, 964 P2d 1015 (1998).

With due respect to the trial court, in our view, although the easement's provisions are exceptionally broad, they are also clear and unambiguous, so the trial court should not have relied on the circumstances surrounding the document's execution to determine the meaning of "existing roads." *Fendall v. Miller*, 99 Or 610, 619, 196 P 381 (1921) (the court will look beyond the wording of the instrument only where there is an uncertainty or ambiguity). By written

agreement, the declarants noted that they were owners of property "over which a private road and logging roads" are located. The declarants gave mutual nonexclusive easements for ingress and egress "across all existing roads (logging, main roads and *any others*) as well as any roads that may be built in the future."[4] (Emphasis added.) The roads are not to be "obstructed by any owner for any purpose, unless with prior written consent to all owners."

The easement agreement does not limit its scope to improved roads. It provides:

> "The private roads shall be used for ingress and egress purposes only and shall not be obstructed by any owner for any purpose, unless with prior written consent of all owners. The present improved private road is presently graded and graveled and is utilized as a road and shall be maintained and repaired in a similar condition for such purpose."

Thus, the easement agreement makes reference to multiple "private roads," and also refers to "[t]he present improved private road" that "is presently graded and graveled and is utilized as a road." Viewed in its entirety, the agreement reflects that, at the time of the document's execution, the parties were aware that there were multiple roads on the property, but that there was only one road that was improved, graded and graveled and used as a road. The unambiguous implication is that the easement's reference to "existing roads" includes unimproved roads that are not graded or graveled or used as roads.[5]

Thus, the trial court's conclusion that the easement's reference to "existing roads" means only roads that were drivable at the time of the easement's execution is not consistent with the easement's express terms. Nor is it consistent with the trial court's own finding as to the easement's

---

[4] We are not called upon to consider nor do we address whether an agreement for an easement over future roads would be enforceable.

[5] In view of our conclusion that the easement agreement is susceptible to only one plausible interpretation and is not, therefore, ambiguous with respect to whether the Adams and Ridge Roads are existing roads, there is no need to rely on evidence of the circumstances surrounding its execution or to apply the rule that ambiguous easements are to be construed against the grantor and in favor of the grantee. *See Tipperman*, 327 Or at 545.

purpose—to provide access to the 40-acre parcel—or with the parties' own use of the easement for that purpose. For access to the 40-acre parcel, the Cutlers rebuilt Adams Road on the Furrows' (and now plaintiffs') property, which was largely impassable at the time of the execution of the agreement. Thus, consistent with our conclusion that the easement includes unimproved roads as "existing roads," as well as with the parties' use of the easement, the only supported finding is that Adams and Ridge Roads are encompassed within the easement's reference to "existing roads."[6]

Despite the trial court's conclusion that plaintiffs do not have an easement over defendant's property on existing roads, the trial court did conclude that plaintiffs have an easement for a road across defendant's property for access to the northwestern portion of their property. As noted, defendant's home is on or immediately adjacent to Ridge Road, which plaintiffs have been using for access to and from the northwestern 200 acres of their property. The trial court concluded that plaintiffs can no longer use that road across defendant's property, because the original parties to the easement "could not have intended to create an easement for the benefit of the owner of the [280-acre parcel] that would pass directly through the homesite location that the Cutlers had created on [defendant's] property." That finding might be supported by the record if the homesite approval that the Cutlers had from the county before the execution of the easement agreement was in the same location where the homesite was ultimately built. But the Cutlers did not develop the homesite until some two years after the execution of the easement agreement and, as noted, the pad for the homesite as placed directly on or adjacent to the road, in a location

---

[6] As noted, the easement also applies to "any roads that may be built in the future." The parties are not arguing about the enforceability of that provision. In fact, the trial court relied on it as the basis for its conclusion that the Cutlers and the Furrows must have intended for a new road to be constructed over defendant's property to give access to the northwestern part of plaintiffs' property. In any event, in view of our conclusion that Adams and Ridge Roads were existing roads at the time of the execution of the easement, we need not address whether, if they were not, the "future roads" provision would nonetheless give plaintiffs an easement over the "improved" versions of those roads or over the new road built by Offenbacher, which defendant describes as her driveway. As earlier noted, plaintiffs have not sought a declaration of an easement over that new road.

different from that approved by the county. There is no evidence that, at the time the easement agreement was executed, the Cutlers were contemplating a homesite location on the existing roadway, where the house is now built. Thus, neither the easement itself nor the surrounding circumstances provide support for the trial court's finding that the parties did not intend the easement to travel over the existing roadway on defendant's property.

The remaining question is whether, having concluded that plaintiffs were entitled to an easement over defendant's land for access to the northwestern portion of their property, the trial court had authority to require the building of a new road over defendant's property for plaintiffs' benefit, away from defendant's homesite. We appreciate the trial court's motivation to resolve the parties' conflict, but no party sought the creation of a new road,[7] and we conclude that the trial court erred in granting relief that was not requested. *Stonier v. Kronenberger*, 230 Or App 11, 21-22, 214 P3d 41 (2009).

The trial court concluded that defendant's installation of an unlocked gate on Adams Road did not obstruct the easement, and we agree. An easement owner is limited to the uses of the easement that are reasonably necessary to satisfy the easement's intended purpose. *Tooker v. Feinstein*, 131 Or App 684, 687, 886 P2d 1051 (1994), *rev den*, 321 Or 94 (1995). The servient estate owner maintains dominion over the easement land and has the right to use that land, as long as that use does not unreasonably interfere with the easement owner's use. *Clark v. Kuhn* 171 Or App 29, 33, 15 P3d 37 (2000); *Wagner v. O'Callaghan*, 104 Or App 284, 287, 800 P2d 309 (1990). In *Jones et ux. v. Edwards et ux.*, 219 Or 429, 433, 347 P2d 846 (1959), the Supreme Court said that a gate across an easement may be permitted if the reasonable use of the servient estate makes such a gate necessary. *See also Ericsson v. Braukman*, 111 Or App 57, 62, 824 P2d 1174, *rev den*, 313 Or 210 (1992). We conclude that defendant's placement of an unlocked gate as a demarcation of her property line and as a deterrent to trespassers is a

---

[7] We note that the trial court rejected plaintiffs' alternative claim that, if there was no express easement, they were entitled to an implied easement.

reasonable use of the servient estate that does not unreasonably interfere with plaintiffs' use of the roadway.

Having concluded that plaintiffs have an easement on defendant's property beyond the gate and over the existing roadway shown on aerial photographs in 2001 for ingress and egress to their property, we remand the case to the trial court for consideration whether defendant has otherwise encroached upon that easement.[8]

On cross-appeal, reversed and remanded; appeal dismissed as moot.

A: Defendant's home as built
B: Defendant's approved home site
C: Gate built by defendant
D: Area of plaintiffs' property to which they seek access
o——o——o : "Adams road"
x——x——x : "Ridge road"
———————— : Driveway

---

[8] We note that defendant does not cross-assign error to the rejection of her counterclaim for the imposition of reasonable restrictions on plaintiff's use of the easement.